872 A.2d 1067 (2005)
377 N.J. Super. 298
Ronald J. FROOM and Froom Development Corp., Plaintiffs-Respondents/Cross-Appellants,
v.
Marc A. PEREL; Robert J. Ambrosi; Edward Jaten; John C. Walsey; Ronald Saverin; J.W. Trust; Edison I HD, LLC; Edison I North, LLC; Edison Prince, LLC; Edison I South 34A, LLC; Edison I South 34B, LLC; Eidson I North 35A, LLC; Edison I North 35B, LLC; Edison I North 35C, LLC; Edison I North 35D, LLC; John Doe, Inc. 1-5, John Doe(s) 1-5, Defendants, and
Vincent P. Maltese, Esq. and Wilentz, Goldman & Spitzer, P.C., Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 7, 2005.
Decided April 27, 2005.
*1069 Robert G. Rose, Florham Park, argued the cause for appellants/cross-respondents (Pitney Hardin, attorneys; Mr. Rose, Elizabeth J. Sher and Paul J. Halasz, on the brief).
Gregory A. Anderson of the Florida bar, admitted pro hac vice, argued the cause for respondents/cross-appellants; (Anderson, St. Denis & Glenn and Maran & Maran, attorneys; Mr. Anderson, Brooks C. Rathet, admitted pro hac vice, and David Maran on the brief).
Before Judges PETRELLA, PARKER and YANNOTTI.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
Defendants Wilentz, Goldman & Spitzer, P.C. and Vincent P. Maltese, a member of the firm, (the Wilentz defendants) appeal from a final judgment entered in favor of plaintiff Froom Development Corp. (FDC) on a legal malpractice claim. FDC cross-appeals from the judgment. We reverse the judgment and dismiss the cross-appeal as moot.

I.
Plaintiff Ronald J. Froom is a commercial real estate broker. Sometime in 1991, Froom learned about a 27-acre tract of property owned by Berger Industries, Inc. (Berger) and located in Edison, New Jersey. Although the property consisted of an "old mostly abandoned manufacturing facility" and was "in horrible disrepair," Froom considered the property a "diamond in the rough" because of its "great" location. He envisioned the property as the site of "a large shopping center." Froom informed defendant John C. Walsey, an experienced investor and developer, about the property. Walsey also saw its potential and agreed to proceed with the acquisition and development of the property.
According to Froom, in the summer of 1992, he and Walsey had a telephone conversation during which they discussed their respective interests in the venture. Froom asserted that Walsey agreed he would provide all of the money to acquire and develop the property but Froom would receive a 50% non-dilutable ownership interest in the project. To Froom, non-dilutable meant that his 50% interest would remain unchanged even if other investors subsequently were brought into the deal. Froom described himself as a "sweat equity" developer who locates the property, performs preliminary research and investigations, prepares a demographic profile report and retains an architect to prepare a preliminary rendering.
Walsey's version of his deal with Froom was different. He testified he told Froom that, although he lacked money at the time, he could arrange financing from third-party investors and Froom would receive 50% of any return that Walsey received from the property. Walsey also said that Froom's interest would be converted to an equity position only after these conditions were met: Walsey must recover all of his investment in the project, Froom could not interfere with the financing of the venture by having an equity position and Froom had to perform as a day-to-day developer of the project.
Froom was advised to consult Maltese at the Wilentz firm to discuss the firm's *1070 qualifications to handle the transaction. Froom met Maltese in September 1993 and Maltese introduced Froom to Steven Tripp, an attorney at the firm with zoning experience. Froom told Maltese and Tripp that he wanted to retain the Wilentz firm and he encouraged Tripp to make inquiries about rezoning of the property. Froom informed Maltese that Walsey also would be participating in the project and Maltese would soon be hearing from him.
Walsey called Maltese several days later. As a result, in mid-November 1993, Maltese attended a meeting where discussions were held with Berger's representatives and certain creditors with liens on the property. In November or December 1993, Maltese prepared draft contracts for the purchase of the property. Initially, FDC was listed as the sole purchaser, but later the contracts were changed and FDC and Walsey's company, W.L. Associates (WL), were identified as purchasers. At or about this time, Berger filed for protection under the federal bankruptcy code.
In December 1993, Maltese prepared an engagement letter and he addressed the letter to FDC and to WL. Maltese noted that he was writing to
confirm that Froom Development Corp., a Florida Corporation ("Froom"), and W.L. Associates, Inc. ("Associates") have requested this law firm to represent their interests in connection with the purchase of a parcel of land located along Route 1 in Edison, New Jersey presently owned by Berger Industries, Inc.
After setting forth billing rates and the obligation to reimburse the firm for its expenses and disbursements, Maltese requested an advance retainer of $7,500. Maltese added that "[t]he terms of this engagement do not cover any litigation matters related to the Project, the partners' interests therein or for any other reason. Litigation matters must be covered by a separate engagement arrangement." Maltese also stated:
Although we don't anticipate a problem in this matter, in the event any conflict of interest arises during the course of our representation it may become necessary for our firm to cease all work on this matter pending resolution of the conflict. In the event the conflict cannot be resolved you reserve the right to transfer the file to another lawyer but, in any event, you agree to pay our firm for all work performed even if the resolution of the conflict results in a transfer of the matter to another attorney or law firm.
Maltese requested that Froom and Walsey countersign the letter and return it to him.
When he received no response from Froom to his letter, Maltese wrote to Froom in January 1994 and requested that the signed engagement letter and retainer be forwarded to him in short order. Froom responded and told Maltese that he "was not going to be responsible for any financial obligation" in hiring the firm and he wanted to check with Walsey before proceeding any further. Walsey thereafter told Froom, "[S]top wasting time, sign the letter and send it back." Froom claimed that he signed the letter and returned it.
Maltese testified that during a January 1994 telephone conversation, Froom told him for the first time that Wilentz was not representing FDC but was representing WL. Maltese said that Froom informed him that FDC would not be paying any legal fees and WL would be the responsible party. Froom told Maltese that Walsey would call him to discuss the matter. After receiving a telephone call from Walsey, Maltese concluded that the Wilentz firm no longer represented FDC. Maltese testified that he never received a signed retainer from Froom on behalf of FDC.
*1071 On January 21, 1994, Maltese sent to FDC an invoice for services rendered to that date by the Wilentz firm. Froom testified that after receiving this bill, he immediately called Maltese and reminded him that Walsey was responsible for paying Wilentz's charges. According to Froom, Maltese replied, "That's right, you did tell me that Ron, I'm sorry, don't worry about it."
A meeting was held at the Wilentz offices on February 28, 1994, attended by Berger's representatives, Froom, Walsey, and defendant Ronald Saverin, who was introduced to Maltese by Walsey as a prospective participant in the venture. In June 1994, Maltese forwarded to Berger's counsel a term sheet he had prepared. The document listed "W.L. Associates, Inc. (or its nominee)" as the prospective purchaser and it was initialed by Walsey as President of WL. Walsey faxed a copy of the letter and the term sheet to Froom.
At or about this time, Froom learned that draft contracts prepared by Maltese only contained Walsey's name. Froom testified that he called Maltese and Maltese told him that
with the amount of paperwork going back and forth with the bankruptcy issues[,] John [Walsey] [is] in Atlanta, you're in Florida, you're all moving around a bit, to streamline the process it's just easier, but it doesn't really matter because when you get ready to close on the property and the ultimate purchaser, which will be new corporation or a new LLC as they call it, is formed that's when you'll get your stock issue. I know you own 50 percent of the deal and don't worry about it.
On August 2, 1994, Maltese faxed Froom a copy of the term sheet with changes made by Berger's counsel. When questioned about the significance of this and other faxes sent to Froom, Maltese testified that he had been instructed by Walsey to keep Froom "in the loop." Froom asserted that he advised Maltese on numerous occasions that he and Walsey were 50/50 partners in the project and he was going to own 50% of the project. According to Froom, Maltese responded that was "fine."
In September 1994, Maltese forwarded a second billing statement to Walsey in which WL was identified as the firm's client. Several months later, Maltese prepared a certificate of formation for the limited liability company that would acquire the property. The company was called "Edison One, LLC." The certificate stated that the entity was to be comprised of two or more members. Maltese said that he understood at that time that Walsey and Saverin were to be the members.
The purchase agreement was executed on March 25, 1995. Walsey signed the contract in his capacity as managing member of Edison One. Prior to execution of the contract, Maltese may have faxed or called Froom, but Maltese had no distinct recollection of speaking with him. During cross-examination, Maltese acknowledged that in March 1995 he left a message on Froom's answering machine and advised that FDC "was there on the deal." In that message, Maltese advised Froom in detail of the status of certain negotiations with the Berger tenants and informed Froom that he was "certainly part of this deal." Maltese insisted, however, that he was only following Walsey's direction to keep Froom informed of developments with the transaction.
During the summer of 1995, a meeting was held at the Wilentz offices to negotiate the terms of an operating agreement for the project. Walsey and Saverin negotiated the agreement. Froom was present and said nothing when Saverin asked for a 70% to 80% interest in the project. Walsey would not agree to Saverin's demand. *1072 Maltese prepared a draft operating agreement with spaces left blank for insertion of the percentages of each individual's ownership interest. Subsequently, the Edison One operating agreement, dated August 31, 1995, was prepared and executed. It provided that Walsey and Saverin would each own 50% of the project, through their respective companies.
Sometime in 1995, Edward Jaten of ARC (a development group comprised of Jaten, defendant Marc A. Perel and defendant Robert J. Ambrosi) learned that Berger had entered into a contract for the sale of the property to WL. Jaten called Tripp at the Wilentz firm and asked him to set up a meeting with WL. A meeting was arranged at the Wilentz offices. At the meeting, Jaten told Walsey that ARC was interested in participating in the project, had recently completed a major project in Edison, was familiar with the locality and wanted him to consider ARC becoming a joint venture partner.
Froom learned that ARC was interested in participating in the project and he expressed his opposition to Maltese. Saverin also did not want ARC to participate in the venture. He believed that the project could proceed without ARC's participation. Maltese told Froom that ARC was a very formidable company that possessed "great experience and resources" and Froom should keep an open mind on the issue. Maltese also told Froom that ARC had been a client of the Wilentz firm.
A hearing on the contract to purchase the Berger property was conducted by the bankruptcy court on September 12, 1995. Maltese, Froom, Walsey and Jaten were in attendance. The head of Wilentz's bankruptcy department made a presentation on behalf of Edison One. He told the court that Edison One consisted of two members, Saverin's company and Walsey's company. He described development projects that both companies had been involved in throughout the country. No one objected to the sale and the bankruptcy judge approved the contract.
After the hearing, Froom and Walsey went to lunch. Froom told Walsey that he was not in favor of ARC's participation in the project. Froom subsequently sent Walsey a letter dated September 28, 1995 in which he stated:
With the bankruptcy hearing behind us, it is now time for my stock, membership in an LLC or whatever form is to be used, to be delivered to me. We started as partners John, and there should not be a situation in which either of us is in a different position than the other. When the LLC was formed, I should have automatically from day one, been consulted and had my papers put in hand. If this is being handled by Ron's [Saverin] attorney, please have him contact my attorney referenced below [Evan Marbin, Miami, Florida]. If this is being handled by Vince [Maltese], then he should be advised to take the necessary steps to conclude this matter.
According to Maltese, Froom did not consult with him at the time he sent this letter to Walsey.
Under the terms of the contract, Edison One was required to post a $235,000 letter of credit within ten days of the approval of the contract by the bankruptcy court. Edison One did not post the letter of credit and Berger declared a default. During the fall of 1995, Walsey and Saverin negotiated with the ARC to include it in the joint venture. By letter dated November 20, 1995, Maltese advised Berger's counsel of the impending inclusion of ARC as a new member of Edison One and he informed him that ARC soon would be obtaining the $235,000 letter of credit.
In a document entitled Consent to Representation and Waiver of Potential Conflict dated November 21, 1995, Walsey, *1073 The J.W. Trust, Saverin, WL, and Edison One acknowledged their representation by Wilentz in connection with the purchase of the Berger property. The Trust had been created by Walsey for the benefit of his children. The document stated that ARC had reached an agreement with Saverin, Walsey, WL and the Trust that would result in ARC and/or its affiliate Prince Group becoming a member of Edison One.
The document stated in pertinent part:
The Undersigned agree that Wilentz may continue to represent the interests of ... [Walsey, Saverin, WL] and the Trust in Edison I with respect to the organizational documents to be prepared by Wilentz allowing for admission of ARC and/or Prince into Edison I as a Member.... ARC and/or Prince agree that Wilentz does not represent their respective interests in connection with their admission as a Member to Edison I. Wilentz has advised ARC and/or Prince to secure independent counsel to negotiate and/or review the documentation to be prepared by Wilentz.
The consent form was signed by all parties. Neither Froom nor FDC was named in the document and consequently neither party signed the document.
Negotiations between Saverin, Walsey and the ARC group culminated in the creation of a new joint venture on or about December 4, 1995, with Saverin and Walsey each having 25% ownership shares and Edison-ARC, LLC having a 50% ownership share in the venture. Maltese prepared a draft operating agreement which the parties executed in August 1996.
By November 1996, the Trust had run out of money and could not meet calls for infusion of capital to the project. ARC met the capital calls on Walsey's behalf. In December 1996, Walsey offered Froom an opportunity to purchase Walsey's interest for approximately $160,000-$170,000. Although Walsey gave Froom six months to come up with the money, Froom could not do so. Walsey thereupon reached an agreement with ARC under which Walsey reduced his interest in the project from 25% to 5%, and would not be responsible for any additional capital calls. ARC thereby obtained a 70% interest in the project. Saverin retained his 25% interest.
The Wilentz firm's involvement in the transaction ended sometime in March 1997. A meeting was held in August 1997 attended by Froom, Walsey, Jaten, Perel and Ambrosi. At the meeting, Froom asked that he be issued his 50% interest in the project. Ambrosi refused. In a letter to Froom dated December 17, 1997, Walsey traced the history of the project including financial problems encountered:
Unfortunately, this project is not what we started with. The projected profit is much smaller, etc. I have given you the opportunity in the past to cover our position and give you my share. You didn't step forward and therefore, our interest was reduced. We have been partners since the beginning and we are still partners in our interest. Hopefully, someday we will see a profit, as well as any fees we may earn.
The transaction closed in June 1998.
Froom and FDC commenced this action in February 1999. They asserted claims of legal malpractice, fraud, and tortious interference against the Wilentz defendants. They also asserted claims of breach of contract, fraud, tortious interference, and unjust enrichment against Walsey, The J.W. Trust, Saverin, Perel, Ambrosi and Jaten. Prior to trial, Froom's claims against the Wilentz defendants were dismissed because he did not have standing to assert FDC's claims.
The matter was tried before a jury from March 10, 2003 to April 1, 2003. After FDC presented the case, the trial judge *1074 dismissed all claims against the Wilentz defendants except for the legal malpractice claim. The judge denied a motion by the Wilentz defendants to dismiss the claim for lack of proof that the alleged negligence by the Wilentz defendant was a proximate cause of the alleged loss of FDC's interest in the project. FDC's claims against the other defendants were dismissed except for the breach of contract claim. The jury returned a verdict in the amount of $2.7 million against the Wilentz defendants and the same amount was assessed against the other defendants. The judge awarded FDC $694,219 in attorneys' fees and costs of $48,230 for a total judgment against the Wilentz defendants of $3,442,449.60, plus post-judgment interest. The judge denied motions by the Wilentz defendants for a new trial and for judgment n.o.v. FDC subsequently reached a tentative settlement with Walsey, Saverin and the ARC defendants.
On this appeal, the Wilentz defendants argue that: 1) they were entitled to judgment as a matter of law on the issue of proximate cause; 2) the judge erred by not ruling as a matter of law that there was no attorney-client relationship between the firm and FDC; 3) the judge erroneously instructed the jury that FDC was a client of the Wilentz firm; 4) there was insufficient evidence to support the jury's damages award; 5) FDC's legal malpractice claim was not supported by competent, admissible expert testimony; and 6) the judge erred in his award of attorneys' fees. In its cross-appeal, FDC argues: 1) the judge erred in dismissing its claim for punitive damages; and 2) the judge erroneously failed to award pre-judgment interest.

II.
We turn first to the contention by the Wilentz defendants that the trial judge erred in ruling as a matter of law that FDC was a client of the Wilentz firm. Defendants assert that the evidence is clear that the firm was only retained to represent the entity that acquired the Berger property and the firm provided no representation to FDC or to any of the individual members of the acquiring entity. The Wilentz defendants alternatively argue that at the very least there was a genuine issue of material fact as to whether FDC was the firm's client and the trial judge erred when he instructed the jury that there was an attorney-client relationship between FDC and the Wilentz firm.
The existence of an attorney-client relationship is, of course, essential to the assertion of a cause of action for legal malpractice. Conklin v. Hannoch Weisman, 145 N.J. 395, 416, 678 A.2d 1060 (1996). In view of the conflicting evidence on the issue, we are convinced that the judge erred in deciding as a matter of law that there was an attorney-client relationship between FDC and the Wilentz firm. We are satisfied that the evidence presented at trial demonstrated that there was a genuine issue of material fact as to whether FDC was a client of the firm and the judge erred in instructing the jury that FDC and the Wilentz firm had an attorney-client relationship.
As we explained previously, the evidence established that Froom and Walsey initially agreed to acquire and develop the Berger property together. Froom engaged Maltese and the Wilentz firm and he informed Maltese that Walsey would be participating in the transaction. Maltese prepared draft agreements that initially identified FDC and WL as the purchasers. It could therefore be inferred that the Wilentz firm had been retained to protect the joint interests of these two entities. In addition, the December 1993 engagement letter was addressed both to FDC and to WL. In the letter, Maltese wrote that the firm had been retained to represent the *1075 interests of both entities in connection with the acquisition of the Berger property.
The Wilentz defendants argue however that, whatever the nature of the firm's relationship with FDC in the fall of 1993, that relationship was terminated in January 1994 when Froom informed Maltese that the firm was not representing FDC but was instead representing WL. Froom told Maltese that Walsey would be responsible for all of the Wilentz bills. Maltese testified that in his view the firm did not owe FDC a legal duty after January 1994.
FDC presented evidence to counter Maltese's assertion. The record shows that, as the transaction was negotiated over time, Maltese often communicated with and forwarded documents to Froom. Maltese testified that he did so because Walsey wanted him to keep Froom "in the loop" but the evidence could reasonably support an inference that notwithstanding Maltese's assertions to the contrary, Maltese and his firm continued the attorney-client relationship with FDC after January 1994.
Despite this conflicting evidence, the judge found the Wilentz firm had an attorney-client relationship with FDC and he refused to submit to the jury a question that would have required the jury to determine whether FDC was a client of the Wilentz firm. The judge stated:
... I think to the extent that there is at least an admission that at some point in time to some extent there was some client relationship involved. I don't think it's even a question the jury has to determine.
However, as we have pointed out, although Maltese may have admitted that the firm had a relationship of some kind with FDC in the fall of 1993, Maltese maintained that the firm's relationship with FDC terminated in January 1994. The key factual issue was whether, in the period after January 1994, when the transaction was changed and FDC's interest in the project eliminated, the firm had an attorney-client relationship with FDC that required the firm to protect FDC's interest.
This was not an issue that could be decided by the judge as a matter of law. Nevertheless, the judge instructed the jury:
In this action plaintiff contends the defendant did not comply with the standard of care which the law imposes upon him while attending to the legal needs of his client, the plaintiff, legally his client in this case, the plaintiff Froom Development.
The judge thus instructed the jury that there was an attorney-client relationship between these parties and a duty of reasonable care on the part of the firm. The jury was directed to determine whether the Wilentz firm and Maltese were negligent and, if so, to state the amount of damages proximately caused by such negligence.
In our view, the jury instructions were fatally flawed and consequently the finding by the jury that Maltese and the Wilentz firm were negligent cannot stand. Clear and correct jury instructions are essential to a fair trial and the failure to provide them in this case is reversible error. Das v. Thani, 171 N.J. 518, 527, 795 A.2d 876 (2002). "A charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations...." Ibid. (quoting from State v. Martin, 119 N.J. 2, 15, 573 A.2d 1359 (1990)). Here, the trial judge erroneously withdrew from the jury a critical issue of material fact on an essential element of FDC's claim. In doing so, the judge committed reversible error.

III.
Although the judge's error in instructing the jury on an essential element of a cause *1076 of action would ordinarily require that the matter be remanded for a new trial, the Wilentz defendants argue that the judgment should be set aside and the legal malpractice claim dismissed with prejudice because FDC failed to present sufficient evidence to support a finding by the jury that any professional malpractice on their part was a proximate cause of the loss allegedly sustained by FDC. We agree.
In this case, plaintiff was not only required to establish an attorney-client relationship that gives rise to a duty of care by the attorney, and breach of that duty, the plaintiff also was required to show that defendant's breach was a proximate cause of plaintiff's injury. Conklin, supra, 145 N.J. at 416-20, 678 A.2d 1060. To establish the requisite causal connection between a defendant's negligence and plaintiff's harm, plaintiff must present evidence to support a finding that defendant's negligent conduct was a "substantial factor" in bringing about plaintiff's injury, even though there may be other concurrent causes of the harm. Id. at 419, 678 A.2d 1060.
We stated in 2175 Lemoine Ave. v. Finco, Inc., 272 N.J.Super. 478, 487-88, 640 A.2d 346 (App.Div.1994), that:
[t]he general rule in this State is that an attorney is only responsible for a client's loss if that loss is proximately caused by the attorney's legal malpractice. The test of proximate cause is satisfied where the negligent conduct is a substantial contributing factor in causing the loss. The burden is on the client to show what injuries were suffered as a proximate consequence of the attorney's breach of duty. That burden must be sustained by a preponderance of the competent, credible evidence and is not satisfied by mere "conjecture, surmise or suspicion." In the context of this case, the measure of damages is ordinarily the amount that a client would have received but for the attorney's negligence.

[Id. at 487-88, 640 A.2d 346; emphasis added].
In Lemoine, the trial court held that an attorney had committed legal malpractice in connection with a transaction that she negotiated and structured and awarded her former client, damages in the sum of $111,283. Id. at 483, 485, 640 A.2d 346. In connection with the transaction, the attorney prepared a purchase option that had been declared invalid because it was in violation of the New Jersey Real Estate License Act. Id. at 482, 640 A.2d 346. Although we determined that substantial credible evidence existed to support the trial court's malpractice finding, we concluded that the client failed to present sufficient evidence to prove that the malpractice was a proximate cause of his loss. Id. at 487, 640 A.2d 346. On appeal, the plaintiff suggested ways in which the attorney could have legally structured the transaction. Id. at 489, 640 A.2d 346. We held, however, that "legal expert testimony was necessary to show that the complex commercial transaction... could have been legally structured," and because the client failed to present such testimony, he failed to establish proximate cause. Id. at 490, 640 A.2d 346. We added that even if the transaction could have been legally structured, the claim for legal malpractice failed because there was no evidence to show that the other parties to the agreement were willing or able to structure the agreement in that manner. Ibid.
The same principles were applied in Lamb v. Barbour, 188 N.J.Super. 6, 455 A.2d 1122 (App.Div.1982), certif. denied, 93 N.J. 297, 460 A.2d 693 (1983). There, the trial court found an attorney, who had represented the plaintiff purchasers of a business that failed within two months, *1077 professionally negligent. Id. at 9, 455 A.2d 1122. The trial judge based his finding upon an array of "shortcomings" related to the attorney's "duty to furnish advice and guidance and to safeguard his client's legal position." Id. at 10, 455 A.2d 1122. Those shortcomings included the attorney's failures to: (1) tell plaintiffs of his doubts concerning the sufficiency of their judgment, skill and experience to operate businesses of the size involved; (2) warn the plaintiffs that the sellers might have mentioned unreported income just to make a failing business seem more attractive and should have cautioned plaintiffs that the failure to report income could result in a liability to the Internal Revenue Service for back taxes and penalties; and (3) suggest that the plaintiffs acquire a more current financial statement, an accounting of the company's books and an examination of the company's physical equipment. Id. at 10-11, 455 A.2d 1122.
We held, however, that even accepting the finding that the attorney had been negligent, there was insufficient evidence to support a finding that the attorney's negligence was a proximate cause of any loss to the plaintiff. We stated:
[M]ost conspicuous is the absence of testimony by either of plaintiffs as to any circumstances reasonably to be hypothesized under which they could have been dissuaded from completing the transaction. It should not be lightly assumed that these young people would have been easily discouraged from acquiring for a net cash investment of only $4,000 a business which as we said earlier, grossed annual revenues of more than $1,000,000 and which had been successfully operated for approximately 16 years.
[Id. at 12-13, 455 A.2d 1122].
Our decisions in Lemoine and Lamb therefore make clear that in cases involving transactional legal malpractice, there must be evidence to establish that the negligence was a substantial factor in bringing about the loss of a gain or benefit from the transaction. Where, as here, a plaintiff alleges that he suffered a loss in a particular transaction because an attorney failed to take steps to protect his interest, the plaintiff must present evidence that, even in the absence of negligence by the attorney, the other parties to the transaction would have recognized plaintiff's interest and plaintiff would have derived a benefit from it. See also Blackhawk Building Systems, Ltd. v. The Law Firm of Aspelmeier, et al., 428 N.W.2d 288, 290-91 (Iowa 1988)(attorney's negligent failure to include a non-competition clause in an employment agreement was not the proximate cause of injury because plaintiff did not prove that employee would have agreed to that clause).
We are convinced that the evidence presented by FDC was insufficient to support a finding by the jury that any negligence on the part of the Wilentz defendants was a proximate cause of FDC's loss of its purported interest in the project. Based on the evidence presented by FDC, a rational jury could not find that, even had the Wilentz defendants acted to protect FDC's interest, the other parties to the transaction would have agreed to give FDC a 50% ownership interest in the project even though FDC made no financial contribution to acquisition of the property or its development.
At trial, FDC presented testimony from E. Leo Milonas, its legal malpractice expert. Milonas, who is a retired New York appellate judge, testified that there was an attorney-client relationship between FDC and Maltese. He stated that the Wilentz firm had a duty to be loyal to FDC and the firm could not represent others in conflict with the interests of its clients. Milonas stated that, at a minimum, when ARC *1078 agreed to participate in the venture, the firm had a duty to advise FDC as to ARC's role in the project and advise FDC that there may be a conflict of interest in representing both parties. Milonas asserted that it was Froom's understanding that he owned 50% of the project and, in the end, he wound up with nothing. Milonas further testified that Wilentz's actions
obviously caused Mr. Froom damage if you have a proposition where you start off with 50 percent of something and end up with nothing and you're being represented by a law firm throughout, [you're] damaged somewhere in between 100 percent and zero; there's a damage, and I don't know what it is.
When asked whether the Wilentz firm and Maltese proximately caused FDC to suffer damages, Milonas simply replied that, "They committed malpractice." When asked whether the Wilentz defendants had a direct connection to the damages sustained by FDC, Milonas stated, "They caused the damages."
The Wilentz defendants argue that the trial judge erred in permitting Milonas to testify as an expert witness. They note that, under N.J.S.A. 43:6A-13, retired New Jersey state court judges may not practice law in courts of this state. They further note that our Supreme Court has issued a directive to illustrate the extent of the restrictions upon judges who have retired under New Jersey's judicial retirement system. The directive provides, among other things, that it is improper for a retired New Jersey state court judge to appear as an expert witness in a legal malpractice case.[1] The Wilentz defendants assert that these same limitations should be applied to Milonas. We disagree. By their terms, neither the statute nor the Supreme Court's directive applies to judges from other jurisdictions, state or federal. Therefore, the trial judge did not err in allowing Milonas to testify.
However, Milonas' testimony was patently insufficient to establish the requisite causal connection between the alleged legal malpractice by the Wilentz defendants and the damages allegedly sustained by FDC. Milonas' conclusions on the issue were clearly "net opinions." An expert's opinion must be based on facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial. N.J.R.E. 703. The "net opinion" rule renders inadmissible any opinion consisting of bare conclusions that are unsupported by factual evidence. Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). An expert must "give the why and wherefore" of his or her opinion, rather than a mere conclusion. Jimenez v. GNOC Corp., 286 N.J.Super. 533, 540, 670 A.2d 24 (App.Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996).
Here, Milonas' opinions on proximate cause were no more than bare conclusions that were unsupported by any factual evidence. Milonas simply assumed that FDC was damaged because, in his view, the Wilentz defendants committed professional negligence. There was no evidence that, even had the Wilentz defendants not committed professional malpractice, as alleged by FDC, the transaction would have gone forward with the other parties agreeing to allow FDC to retain a 50% interest in the project. Milonas' testimony was a conclusion without any factual basis whatsoever.
FDC argues, however, that it presented sufficient evidence from which reasonably minded jurors could determine that the alleged malpractice by the Wilentz defendants *1079 was a substantial factor in causing FDC's loss. FDC argues that although no expert with a background in real estate development could say with "absolute certainty" that ARC or another investor would have provided funding for the project if FDC claimed a 50% interest, the trial testimony established that there was a substantial probability that the project would have attracted the necessary financing even if FDC retained a 50% interest and made no financial contribution whatsoever. FDC maintains that, even without an expert, a jury could have concluded that the project would have been worth the financial contributions made by ARC and Saverin even after considering FDC's 50% interest. We disagree.
We reject FDC's contention that expert testimony was not required on the issue of proximate causation in this case. Expert testimony is required when the issue is beyond the "common knowledge of lay persons." Kelly v. Berlin, 300 N.J.Super. 256, 265-66, 692 A.2d 552 (App.Div. 1997). The transaction here was undoubtedly a complex real estate acquisition and development. In our view, jurors could not be expected to know, based on their own common knowledge and experience, whether sophisticated investors would be willing to invest in the acquisition and development of the property and allow FDC to retain a 50% interest while making no monetary contribution to the project. We harbor serious doubts as to whether investors would be willing to provide all of the capital for the acquisition of the property and its development while agreeing to yield one-half of their gain to a party providing no financial contribution whatsoever. FDC did not present any competent expert testimony that would have allowed a jury to accept such a dubious proposition.
Moreover, even were we persuaded that expert testimony was not required in this case, the testimony of the fact witnesses failed to provide an evidential foundation for a finding that the other parties to the transaction would have recognized FDC's 50% ownership interest if the Wilentz defendants acted to protect FDC's interest. Contrary to FDC's contentions, Saverin's testimony does not support its claim that the project would have secured investors even if FDC claimed a 50% interest. Saverin testified that he had the financial capability to meet all obligations of the joint venture and, after he came into the deal, he would finance it for a 50% interest, leaving 25% for Froom and 25% for Walsey. FDC contends that if Saverin would have financed the transaction for a 50% interest, then the jury was free to find that other reasonable investors would similarly have financed the deal for a 50% interest.
We are not persuaded by this argument. Saverin's testimony only pertained to the agreement he reached with Walsey in June 1995 to make equal capital contributions to the project with Walsey. Saverin did not state that he would invest in the project and allow other parties to have a 50% interest while making no financial contributions to the venture. Futhermore, in response to Wilentz's summary judgment motions, Saverin submitted a certification in which he stated that he would never have agreed to a demand by FDC for a 50% interest in the venture. Saverin stated "without reservation" that he would never have participated in the project if he had known that Froom was asserting a 50 percent ownership claim without any financial obligation to the project.
The testimony of real estate broker Jeff Troy also provides no support for FDC's argument. At trial, FDC endeavored to elicit testimony from Troy as to whether his firm would have invested in the project in lieu of ARC or Saverin. The judge *1080 sustained the objection to the question because no foundation had been established regarding the terms of such an investment. Thus, Troy never addressed the issue in his trial testimony. What is more, in his deposition testimony, Troy conceded that FDC's chance of obtaining a 50% "sweat equity" investment from any investor "would be something that you would not see."
The testimony of Dr. David Scribner, FDC's real estate appraisal expert, also provides no support for FDC's claim. Scribner stated in a certification submitted in response to Wilentz's summary judgment motion that he had identified certain willing investors for the project. However, at his deposition, Scribner stated that he had never informed these investors about FDC's "demand" for a 50% interest, or certain environment and zoning problems that had to be overcome to develop the property. Scribner conceded that he could only speculate as to whether these investors would have agreed to FDC's demand for a 50% interest with no financial investment. At trial, Scribner did not testify on this issue.
FDC additionally argues that it was not required to prove that the other investors would have acquiesced in its demand for 50% of the project. FDC says that Wilentz's negligence deprived it of the opportunity to protect its interest in the project, causing a loss of some percentage up to a 50% share of the project. FDC contends that the notion of a "non-dilutable" 50% interest is merely a "straw man" set up by the Wilentz defendants to defeat its claim. FDC asserts that, had the Wilentz defendants protected its interest in the project, it could reasonably have sought to retain an interest "at or below" 50% for locating the property, initiating the project, performing due diligence, bringing in the initial investor and locating three key tenants.
FDC's assertions are unconvincing. At trial, FDC never pursued a claim for anything less than 50% of the project. FDC's counsel made that demand in his opening statement. Froom advanced that claim in his trial testimony. When discussing the verdict sheet at the charge conference, FDC's counsel rejected the judge's suggestion that the jury be permitted to select FDC's percentage of ownership. Defense counsel asserted that the only percentage before the jury was 50% and FDC's counsel agreed. Thus, throughout the trial, FDC proceeded on the claim that, as a consequence of Wilentz's alleged malpractice, it had sustained a loss of its 50% interest in the project.
In our view, it is too late in the day for FDC to contend that the jury should have been free to find that FDC suffered a loss in the project of some percentage less than 50%. In any event, there was no evidence to support any claim for the loss of something less than 50% of the project. As we have explained, there was no competent testimony from any expert that the investors in this complex real estate transaction would have acquiesced to giving FDC any percentage of the project. There was no evidence whatsoever that the parties to the transaction or other potential investors would have agreed that FDC could retain a percentage of something less than 50% even though it was making no financial contribution to the project.
Reversed and remanded for entry of judgment dismissing the legal malpractice claim against the Wilentz defendants with prejudice. The cross-appeal is dismissed as moot.
NOTES
[1] The Supreme Court issued Directive # 2-97 on March 19, 1997. It was superceded by Directive # 7-04 on May 17, 2004 but the sections pertinent to this appeal were not changed.