**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0534-21

EDWARD HARRINGTON
HEYBURN,

      Plaintiff-Respondent,

v.

DEBORAH MADAIO and
ROBIN FORCHION,

      Defendants,

and

EDWARD FORCHION,

      Defendant/Third-Party
      Plaintiff-Appellant,

v.

EDWARD HARRINGTON
HEYBURN and EDWARD
HARRINGTON HEYBURN,
ESQ., LLC,

      Third-Party Defendants.

_____

Argued October 11, 2022 – Decided October 27, 2022

Before Judges Mayer, Enright, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1627-17.

Kenneth S. Thyne argued the cause for appellant (Roper & Thyne, LLC, attorneys; Kenneth S. Thyne, of counsel and on the briefs).

Edward Harrington Heyburn, respondent, argued the cause pro se.

PER CURIAM

Defendant/third-party plaintiff (defendant) Edward Forchion challenges a June 5, 2020 order: granting a motion in limine filed by plaintiff/third-party defendant (plaintiff) Edward Harrington Heyburn; dismissing defendant's legal malpractice claim; and barring defendant's claim for emotional distress.[1]  We affirm.

Defendant describes himself as a "well-known . . . activist for the legalization of marijuana" and is known as the "New Jersey Weedman."  Years ago, with the assistance of a confidential informant (CI), the Trenton Police Department (TPD) investigated defendant.  Based on its investigation, in April 2016, the TPD arrested and charged defendant with various drug-related

---

[1] Defendants Deborah Madaio and Robin Forchion are not parties to this appeal.

A-0534-21

offenses. Defendant hired plaintiff's former law firm to represent him on these and other unrelated charges.

While defendant's criminal matter was pending, the State moved to protect the identity, likeness and address of the CI. Contemporaneously, defendant attempted to find out the CI's identity. According to defendant, plaintiff not only advised him he was entitled to discover the CI's identity but also encouraged him to track down this information before the trial court ruled on the State's pending motion.

A fair reading of the record reflects defendant, at times, acted with plaintiff's encouragement to discover the CI's identity, and, at other times, defendant acted on his own initiative. For example, in one email exchange between the parties in August 2016, defendant informed plaintiff he "posted [the alleged CI's] picture and asked [the CI] to call [defendant]." Plaintiff responded by email less than two hours later, advising defendant, "[t]hat is what I asked you not to do. They will use that against us when we ask for his identity. Watch. I wanted to send someone out privately to talk with [the alleged CI] . . . . Get him to contradict himself." In the same email, plaintiff inquired if defendant knew the CI's name and phone number.

A-0534-21

Thereafter, defendant attempted to expose the CI's identity by posting on defendant's social media accounts. Further, he uploaded a YouTube video about the suspected informant. Defendant's followers commented on his posts with statements such as: "Get him, man, you got this"; "If you find the rat, make sure you let me get the paperwork so I can post it on Stop Snitchin' here on Facebook"; and "Once you find out, make sure you expose that fucking snitch."

In October 2016, defendant communicated with an individual at the Trentonian, a daily newspaper serving the Trenton community, advising the individual that defendant had "posted a[n] image of [his] Rat." A few days later, defendant sent an email to plaintiff containing a hyperlink to a website entitled "njweedman.com/WANTED.htm." The hyperlink contained a copy of a "WANTED" ad with a picture of the alleged informant. Defendant's accompanying message to plaintiff read, "I have not released this yet . . . . Maybe a day or so." Plaintiff responded, "[g]o ahead. You put the caveat that no one should harass him. I am fine with this. Good Job!!"

Shortly after this exchange, the relationship between the parties soured. According to an article printed in the Trentonian regarding an October 2016 hearing, plaintiff purportedly told defendant "not to contact the prosecutor" and to "run any communication through him." The article also quoted plaintiff as

4

saying, "I may not be in this case much longer" and "I don't need to fight [with] my client."

Two days later, defendant issued a press release publicly apologizing to plaintiff, stating, "I was wrong.  I should shut up sometimes . . . . I am not as patien[t] . . . as my lawyer . . . . I apologize for my outspokenness and for embarrassing my attorney and openly ask Edward Heyburn to stay on board."

In February 2017, defendant was indicted on charges of second- and third-degree witness tampering, N.J.S.A. 2C:28-5a; he was arrested days later.  He remained detained for over 400 days before he was found not guilty of the charges.

In May 2017, plaintiff moved to be relieved as defendant's counsel.  Two months later, plaintiff sued defendant and his girlfriend for libel and slander; plaintiff subsequently amended his complaint to include defendant's sister.  In his complaint, plaintiff alleged that once he was relieved as defendant's counsel, defendant gave an interview to a local newspaper, the Trenton Times, claiming plaintiff "betrayed" defendant.  Further, plaintiff alleged defendant "provided the Trenton Times with false statements" about the legal advice plaintiff gave him and that defendant's statements damaged plaintiff's professional reputation.  Additionally, plaintiff alleged that after defendant was incarcerated on the

witness tampering charges, his girlfriend and sister assumed control of defendant's social media accounts and posted disparaging comments about plaintiff, further harming his reputation.

Defendant answered the complaint and filed a counterclaim and third-party complaint against plaintiff. Defendant alleged plaintiff committed legal malpractice and that "[a]s a direct consequence of . . . [plaintiff's] advice," he faced "felony charges and [was] incarcerated." Further, defendant alleged plaintiff "was retained for non-economic interests, and therefore, [was] liable for emotional distress [damages] arising from his professional negligence."

Defendant retained Brooke Barnett, Esq. to provide an expert report addressing whether plaintiff deviated from the professional standard of care while representing defendant. In preparing her report, Barnett stated she "opined based on the facts as set forth by [defendant] in his [third-party c]omplaint and his [a]nswers to [i]nterrogatories and accepted same as true." She concluded "[a]ll of defendant's actions taken regarding the [CI] were with the knowledge and encouragement of his then-attorney, [plaintiff]," including plaintiff's advice regarding "'outing' the confidential witness while a motion was pending by the [S]tate to keep the identity of the [CI] from [defendant]." Further, she opined defendant

6

was incarcerated directly as a result of [plaintiff's] misconduct and is entitled to collect all damages that were proximately caused by this deviation of the standard of care. As [plaintiff] was representing [defendant] for a non-economic reason, he is entitled to collect emotional distress damages and the non-economic damages that resulted from his incarceration.

Plaintiff filed a motion in limine to bar Barnett from testifying at trial, alleging the expert's report was a net opinion. He also contended the legal malpractice action should be dismissed based on the conclusory nature of Barnett's opinion. Additionally, plaintiff moved to bar defendant's claim for emotional distress damages.

The motion judge heard argument on plaintiff's applications on June 5, 2020. During argument, plaintiff highlighted that Barnett "did not review any of the underlying records, with the exception of defendant's answers to interrogatories and the [third-party] complaint" before she rendered her opinion. Plaintiff explained Barnett failed to "review the transcript from the grand jury proceedings which outlined disturbing behavior by [defendant] . . ., including contacting the family of the . . . [CI]." Additionally, plaintiff highlighted that while he represented defendant, defendant posted a "Facebook video that . . . went on to intimidate the [CI]" and defendant failed to apprise plaintiff "that he

was . . . going to go on in a series of Facebook video[s] and discuss his thoughts about that."

Plaintiff also informed the judge that defendant "made a series of statements to the Trentonian" and when "asked about whether he was concerned about the safety of his [CI]," and whether he "care[d] if the [CI] gets shot in the head, . . . he said no, he's concerned only about the jail time that he has to do." Plaintiff stated defendant's actions "triggered his indictment, and . . . ha[d] absolutely nothing to do with me."

The judge granted plaintiff's motions, citing the court's duty "to fulfill [its] gatekeeping role." The judge acknowledged "it's not required that the expert . . . look at every document or every piece of evidence in order to give a competent opinion." He added, "[b]ut here, the facts that underlie her opinion are completely deficient." The judge concluded Barnett's report lacked "an appropriate factual foundation," explaining, "the central, critical documents were not reviewed, were ignored . . . . And so, . . . I think it would be completely speculative on the issue of liability and most particularly proximate cause — really on proximate cause is where this is deficient."

Further, the judge determined if Barnett provided testimony, she would be "speculating . . . in giving that testimony in light of the deficiency in the factual

foundations of her opinion." Based on this determination, defendant's attorney agreed with the judge the legal malpractice claim would have to be dismissed, admitting, "I can't prove a legal malpractice claim on these facts without an expert, Judge."

Finally, the judge barred defendant's claim for damages based on emotional distress, finding that "without medical documentation or medical expert, the claim for emotional distress damages would be deficient." Following argument, the judge entered a conforming order: deeming Barnett's report an "inadmissible net opinion"; dismissing defendant's legal malpractice claim with prejudice; and barring defendant's claim for emotional distress damages.[2]

On appeal, defendant contends the judge erred in finding Barnett's opinion was a net opinion. He also argues the judge mistakenly dismissed his legal malpractice claim and barred his claim for emotional distress. We disagree.

"Our review of the trial court's evidential rulings 'is limited to examining the decision for abuse of discretion.'" Ehrlich v. Sorokin, 451 N.J. Super. 119, 128 (App. Div. 2017) (quoting Parker v. Poole, 440 N.J. 7, 16 (2015)). Thus,

---

[2] The June 5 order also confirmed the voluntary dismissal of a crossclaim filed by defendant Deborah Madaio. More than a year later, on September 20, 2021, all parties formally stipulated to the dismissal, with prejudice, of the complaint and "counter-claim."

we review with deference a trial court's decision to admit or exclude expert testimony. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011). Further, "[w]e apply the same [deferential] standard of review to in limine motions adjudicating the admissibility of evidence." Primmer v. Harrison, 472 N.J. Super. 173, 187 (App. Div. 2022) (citation omitted).

Expert testimony is admissible if

> (1) the intended testimony . . . concern[s] a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that such an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [DeHanes v. Rothman, 158 N.J. 90, 100 (1999) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)).]

Regarding defendant's cause of action, we note as a threshold matter that "[l]egal[] malpractice suits are grounded in the tort of negligence." McGrogan v. Till, 167 N.J. 414, 425 (2001) (citations omitted). "[A] legal malpractice action has three essential elements: '(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff.'" Jerista v. Murray, 185 N.J. 175, 190-91 (2005) (quoting McGrogan, 167 N.J. at 425). "The plaintiff bears the burden of

establishing those elements by some competent proof." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (citations omitted).

Generally, a client only recovers losses proximately caused by the attorney's professional negligence. Lieberman v. Emps. Ins. of Wausau, 84 N.J. 325, 341 (1980); Froom v. Perel, 377 N.J. Super. 298, 313 (App. Div. 2005). "Proximate cause consists of 'any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'" Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Conklin v. Hannoch Weisman, 145 N.J. 395, 418 (1996)).

"To establish the requisite causal connection between a defendant's negligence and plaintiff's harm, plaintiff must present evidence to support a finding that defendant's negligent conduct was a 'substantial factor' in bringing about plaintiff's injury, even though there may be other concurrent causes of harm." Froom, 377 N.J. Super. at 313 (citing Conklin, 145 N.J. at 419). "The burden . . . on the client to show what injuries were suffered as a proximate consequence of the attorney's breach of duty . . . must be sustained by a preponderance of the competent, credible evidence and is not satisfied by mere

11

'conjecture, surmise or suspicion.'" 2175 Lemoine Ave. Corp. v. Finco, Inc., 272 N.J. Super. 478, 487-88 (App. Div. 1994) (citations omitted).

Therefore, for defendant to prevail on his legal malpractice claim, he not only needed to establish through expert opinion that plaintiff deviated from the applicable standard of care, but he also needed to show by a preponderance of evidence that any alleged damages flowing from his arrest, indictment, and incarceration on witness tampering charges were proximately caused by plaintiff's deviation from the standard of care. We agree with the motion judge that Barnett's expert report was lacking on the element of proximate cause.

N.J.R.E. 703

> mandates that expert opinion be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts."
>
> [Townsend, 221 N.J. at 53 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).]

"The net opinion rule is a 'corollary of [Rule 703] . . . which forbids the admission into evidence of expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (quoting Polzo, 196 N.J. at 583). Under the net opinion rule, experts must "be able to identify the factual bases for their

12

conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are [] reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). Thus, "[t]he net opinion rule is succinctly defined as 'a prohibition against speculative testimony.'" Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). Stated differently, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Townsend, 221 N.J. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

Here, Barnett admittedly relied solely upon defendant's third-party complaint and his answers to interrogatories to support her opinion. As the judge noted, the expert's narrow approach led to "central critical documents" being ignored, including "grand jury testimony, . . . any documents or . . . [answers to] interrogatories by [plaintiff][,] . . . . the criminal complaints, [and] any of the documents or facts that underlie the grand jury indictment."

While "[a]n expert's proposed testimony should not be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant'" it must still properly address the issue of proximate cause. Townsend, 221 N.J. at 54 (quoting Creanga v. Jardal, 185 N.J.

345, 360 (2005)); <u>Dawson v. Bunker Hill Plaza Assocs.</u>, 289 N.J. Super. 309, 322-25 (App. Div. 1996) (upholding summary judgment where the expert's report was an inadmissible net opinion on proximate cause).  Here, Barnett wholly ignored pertinent facts about defendant's arrest, indictment and incarceration for witness tampering, despite that those facts were outlined in multiple documents produced to defendant.  Therefore, we are persuaded the judge correctly deemed her opinion to be a net opinion and found her anticipated testimony on the issue of liability "would be completely speculative."  Moreover, we are convinced defendant's attorney properly acknowledged that without Barnett's testimony, defendant could not support his professional negligence claim.

Similarly, we are not persuaded the judge erred in barring defendant's claim for emotional distress damages.  As discussed, "an attorney is responsible for the loss proximately caused the client by his [or her] negligence."  <u>Gautam v. De Luca</u>, 215 N.J. Super. 388, 397 (App. Div. 1987).  "Generally, damages are awarded on the basis of economic loss."  <u>Nieves v. Adolf</u>, 241 N.J. 567, 583 (2020) (citing <u>McGrogan</u>, 167 N.J. at 425).  But "emotional distress damages are . . . potentially recoverable in certain legal malpractice settings."  <u>Ibid.</u>

Although we previously acknowledged the possibility of a plaintiff recovering emotional distress damages in a legal malpractice action, we also cautioned, "emotional distress damages should not be awarded in legal malpractice cases at least in the absence of egregious or extraordinary circumstances." Guatam, 215 N.J. Super. at 399; see also Winstock v. Galasso, 430 N.J. Super. 391, 418-19 (App. Div. 2013) (affirming the dismissal of plaintiffs' claims for emotional distress damages because there was "nothing in the record . . . that substantiate[d] a finding of 'egregious or extraordinary circumstances' warranting this form of relief."). Further, pertinent to this appeal, we noted "such awards would be impermissible in the absence of medical evidence establishing substantial bodily injury or severe and demonstrable psychiatric sequelae proximately caused by the tortfeasor's misconduct." Guatam, 215 N.J. Super. at 399.

As the trial judge noted, defendant did not produce any medical documentation or expert evidence to support his claim for damages for emotional distress. The court properly dismissed the claim.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION