Gregory T. LUDLOW, S. Reid Ludlow, and Jean E. Cowles, Plaintiffs–Appellants and Cross–Appellees,

v.

Lynda S. GIBBONS; Brent Wilson; and Gibbons–White, Inc., a Colorado corporation, Defendants–Appellees and Cross–Appellants.

No. 10CA1719.

Colorado Court of Appeals, Div. III.

Nov. 10, 2011.

Cooper & Clough, P.C., Paul D. Cooper, Jeremy L. Swift, Denver, Colorado; Hensley & Kennedy, P.C., John F. Hensley, Boulder, Colorado, for Plaintiffs–Appellants and Cross–Appellees.

Balaban, Levinson & Costigan, P.C., Kenneth L. Levinson, Cherami Ball Costigan, Bernadette J. Wasilik, Denver, Colorado, for Defendants–Appellees and Cross–Appellants.

Opinion by Judge J. JONES.

Plaintiffs, Gregory T. Ludlow, S. Reid Ludlow, and Jean E. Cowles (together, the sellers), appeal the district court's order granting summary judgment in favor of defendants, Lynda S. Gibbons, Brent Wilson, and Gibbons–White, Inc. (together, the brokers). The sellers also appeal the court's award of attorney fees and costs to the brokers. In the event that we reverse any part of the court's summary judgment order, the brokers conditionally cross-appeal the district court's order striking their nonparty fault designations.

We vacate the summary judgment on the sellers' negligence claims, affirm the summary judgment on the sellers' breach of fiduciary duty claim, vacate the award of attorney fees and costs, and affirm the order striking the brokers' nonparty fault designations.

## I. Background

In March 2000, the sellers entered into an exclusive listing agreement with Gibbons–White, Inc., for the sale of approximately 131 acres of vacant land in Boulder County. Over the next seven years, the sellers received offers from at least three different buyers to purchase portions of their land. None of these offers resulted in a completed sale. The last was an offer, contained in a proposed contract to buy and sell real estate, by Bush Development, Inc. in November 2006. On February 6, 2007, Bush backed out of the sale because the company for which it had intended to develop the property had decided not to enter the Longmont area market.

Immediately thereafter, a Bush representative told Richard Groves, the president and chief executive officer of Actis, LLC, a real estate investment business, about the property and the unsuccessful Bush deal. On February 21, 2007, Actis conveyed an offer to the sellers to purchase 49.2 acres of the land (which apparently included the land Bush had offered to buy) for $6,439,910. The offer was signed by Mr. Groves. As pertinent to this appeal, it contained the following provision:

*Reimbursement Agreement:*

On or before sixty (60) days following the Mutual Execution of this Contract, Seller shall provide Buyer with a proposed cost-sharing and reimbursement agreement ("Reimbursement Agreement") relating to shared utilities, road and infrastructure for the Property. This Contract shall terminate unless a mutually acceptable Reimbursement Agreement is placed into escrow with the Title Company on or before the Resolution Deadline. If the Parties are unable to successfully agree to acceptable terms and execute the Reimbursement Agreement on or before the Resolution Deadline, Buyer's Earnest Money shall be refunded to Buyer in full, pursuant to the provisions of Section 2(b) of this Contract Addendum, without penalty. *Buyer's proportionate share of any said shared utilities, road and infrastructure costs for the Property shall be deducted from the Purchase Price referenced in the Contract at Closing.*

(Emphasis added.) The italicized portion of this provision had not appeared in any of the previous offers for the sellers' property. According to Mr. Groves' deposition testimony, he requested that the brokers include this language in the offer because he wanted to purchase the land with certain infrastructure already in place and wanted a credit against the purchase price at closing if the sellers had not installed the infrastructure by that time.

The sellers did not agree to the Actis offer. Instead, they submitted a fully executed counteroffer which reduced the size of the property to be sold to 44.3 acres at a price of $5,790,822.60. It also included an option for Actis to purchase the remaining 4.98 acres at a higher price per square foot. Importantly, the counteroffer did not eliminate the infrastructure credit provision. Mr. Groves agreed to the counteroffer on Actis's behalf without further negotiation.

A few months later, the parties entered into a second contract for the sale of the acreage covered by the option. This contract, which also contained an infrastructure credit provision, brought the total stated purchase price for both parcels to $6,550,073.40.

In negotiating the two contracts and subsequent amendments thereto, the sellers were represented by Cameron Grant and the law firm of Grant, Grant & Goiran, LLP (together, the lawyers). The sellers and Actis were also assisted by Brent Wilson, a real estate broker employed by the listing brokerage firm of Gibbons–White. Though Mr. Grant and Mr. Wilson were involved in the Actis transaction from the start, neither of them informed the sellers that their contracts with Actis contained the infrastructure credit provisions. Therefore, according to the sellers, when they reviewed the draft settlement statement one week before closing, they were surprised to learn that Actis would receive a $1,615,909.95 credit against the purchase price at closing for "infrastructure costs." Despite the credit, the sellers, having been advised that they were legally obligated at that point to go through with the transaction, closed as scheduled.

Thereafter, the sellers brought this action, asserting four claims for relief: (1) professional negligence by the lawyers; (2) professional negligence by the brokers; (3) negligent supervision by Lynda Gibbons, the employing broker of Gibbons–White; and (4) breach of fiduciary duty by the brokers. The sellers alleged that the lawyers' and the brokers' failure to timely advise them of the infrastructure credit provisions in the contracts constituted professional negligence. According to the sellers, this negligence caused them to have to sell their land to Actis for $1.6 million less than what it was worth and what they had thought they would receive under the contracts. The sellers also alleged that Ms. Gibbons' failure to review the contracts and to call attention

to the infrastructure credit provisions constituted negligent supervision on her part. With respect to the claim of breach of fiduciary duty, the sellers alleged that the brokers were in a fiduciary relationship with them for the purposes of this real estate transaction, and breached their fiduciary duties by failing to tell them that (1) they were no longer acting as their agents, but as transaction brokers, and (2) they had a business relationship with Actis.

The brokers designated Mr. Groves and Actis as nonparties at fault pursuant to section 13–21–111.5, C.R.S.2011. The sellers moved to strike these designations. The district court granted the sellers' motion, concluding that neither Mr. Groves nor Actis owed a duty of care to the sellers as a matter of law.

After substantial discovery, the lawyers and the brokers moved for summary judgment. The lawyers argued that the sellers could not establish the causation element of their professional negligence claim against them. However, the sellers and the lawyers reached a settlement agreement before the court could rule on the lawyers' motion.

The brokers likewise argued that the sellers could not prove causation for the professional negligence and negligent supervision claims alleged against them. They also argued that any damages alleged by the sellers were speculative as a matter of law, they had served as transaction brokers in the Actis transaction, and, accordingly, they had owed no fiduciary duties to the sellers as a matter of law.

The district court granted the brokers' motion for summary judgment as to all claims. As relevant here, the district court ruled that (1) the sellers had failed to establish a genuine issue of material fact as to causation because they had not presented evidence that they "would have" sold the property to a specifically identifiable person or entity for $6.6 million but for the brokers' negligence, and (2) the brokers had not owed fiduciary duties to the sellers because they had acted as transaction brokers rather than the sellers' agents.

The brokers subsequently requested attorney fees and costs pursuant to their original listing agreement with the sellers. Finding that the brokers were the prevailing parties in the litigation, the court awarded them attorney fees and costs.

## II. The Sellers' Appeal

### A. Standard of Review

■ We review an order granting summary judgment de novo, applying the same principles that guided the district court's determination. *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 290 (Colo.App.2009). Thus, we will affirm such an order only when the pleadings and supporting documents clearly demonstrate that no issues of material fact exist and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 570 (Colo.2008). In considering whether the moving party has ultimately established its entitlement to summary judgment, we must grant the nonmoving party all favorable inferences that reasonably may be drawn from uncontested facts and resolve any doubt as to whether a triable issue of material fact exists against the moving party. *Lombard*, 187 P.3d at 570.

### B. Negligence Claims

■ As with any negligence claim, to recover on a claim of professional negligence, a plaintiff must prove that the professional owed a duty of care to the plaintiff, the professional breached that duty of care, and the professional's breach of the duty proximately caused the plaintiff injury. *E.g., Stone v. Satriana*, 41 P.3d 705, 712 (Colo. 2002); *City of Westminster v. Centric–Jones Constructors*, 100 P.3d 472, 485 (Colo.App. 2003).

■ To recover on a claim of negligent supervision against the employer of a professional, a plaintiff must prove that the employer had a duty to prevent an unreasonable risk of harm to third persons to whom the employer knew or should have known that the professional would cause harm, *see Keller v. Koca*, 111 P.3d 445, 448 (Colo.2005), and

that conduct of the person supervised caused harm to the plaintiff, *see Arnold v. Colo. State Hosp.,* 910 P.2d 104, 107 (Colo.App. 1995).

The brokers do not claim to be entitled to summary judgment based on the absence of evidence of a duty to the sellers or a breach of that duty. Rather, they claim an absence of evidence of causation of injury.

■ We observe at the outset that the issue whether a defendant's negligence caused a plaintiff injury ordinarily is one of fact for the fact finder to resolve after a trial. *Kaiser Found. Health Plan of Colo. v. Sharp,* 741 P.2d 714, 719 (Colo.1987); *Brown v. Silvern,* 45 P.3d 749, 751 (Colo.App.2001). It is only where the facts are undisputed and reasonable minds could draw but one inference from them that causation becomes an issue of law for the court. *Centric–Jones,* 100 P.3d at 485.

■ The element of causation in a negligence case—often referred to as proximate cause—has two aspects: causation in fact (which is at issue here) and legal causation (which is not). *See Moore v. Western Forge Corp.,* 192 P.3d 427, 436 (Colo.App.2007).[1]

■ A plaintiff proves causation in fact by showing by a preponderance of the evidence that the claimed injury would not have occurred but for the defendant's negligent conduct. *Kaiser Found.,* 741 P.2d at 719; *Allen v. Martin,* 203 P.3d 546, 565 (Colo.App.2008); *see also Graven v. Vail Assocs.,* 909 P.2d 514, 520 (Colo.1995) (the defendant's conduct must have been "a substantial contributing cause of the injury"); *Viner v. Sweet,* 30 Cal.4th 1232, 135 Cal.Rptr.2d 629, 70 P.3d 1046, 1051 (2003) (explaining that the "substantial factor" test subsumes the "but for" test of causation; citing Restatement (Second) of Torts § 432). In other professional negligence contexts, this has been construed to mean that the plaintiff must prove that but for the professional's negligence, the plaintiff would have achieved a better result. For example, where the claim is one for legal

malpractice in litigation, the plaintiff must prove that he would have succeeded in the underlying case but for the attorney's negligence. *See, e.g., Bebo Constr. Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78, 83 (Colo.1999); *Bristol Co., LP v. Osman,* 190 P.3d 752, 755 (Colo.App.2007); *Giron v. Koktavy,* 124 P.3d 821, 824 (Colo.App.2005); *Brown,* 45 P.3d at 751. This is often referred to as proof of the "case within a case." *E.g., Bebo Constr.,* 990 P.2d at 83; *Allen,* 203 P.3d at 563–64; *Giron,* 124 P.3d at 824.

This case does not involve a legal malpractice claim or an underlying lawsuit. But it does involve professional negligence claims and an underlying transaction. Courts in other jurisdictions have held that in a case of alleged negligence in a transaction, the plaintiff must prove that but for the professional's negligence, he would have achieved a "better" or "more favorable" result. *E.g., Viner,* 135 Cal.Rptr.2d 629, 70 P.3d at 1050–54 ("more favorable"); *Jerry's Enterprises, Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.,* 711 N.W.2d 811, 819 (Minn.2006) ("more favorable"); *Smith v. Preston Gates Ellis, LLP,* 135 Wash.App. 859, 147 P.3d 600, 602 (2006) ("better"); *see also Froom v. Perel,* 377 N.J.Super. 298, 872 A.2d 1067, 1076–77 (N.J.Super.Ct.App.Div.2005) ("loss of a gain or benefit"); *Blackhawk Bldg. Sys., Ltd. v. Law Firm of Aspelmeier, Fisch, Power, Warner & Engberg,* 428 N.W.2d 288, 290–92 (Iowa 1988); *see generally* 4 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 36:12, at 1359–67 (2011).

■ Because Colorado law requires proof of a "successful" outcome in "case within a case" scenarios, we think it proper to require a plaintiff in a case of alleged transactional negligence to prove that but for the professional's negligence, he would have obtained a more favorable result. And, though cases from other jurisdictions imposing this requirement usually involve attorney malpractice claims, we see no reason why it should not also apply to negligence claims against other professionals.

---

1. Legal causation requires an examination of policy considerations to determine how far liability for an act should extend. *See City & County of Denver v. Indus. Comm'n,* 690 P.2d 199, 205 (Colo.1984) (Quinn, J., dissenting); *City of Seattle v. Blume,* 134 Wash.2d 243, 251–52, 947 P.2d 223, 226–27 (1997); *see also* Restatement (Second) of Torts § 431.

The following questions remain, however. How may a plaintiff prove this requirement? And did the sellers here submit evidence sufficient to establish a genuine issue of material fact as to causation?

As to the former question, the district court ruled that the sellers had to prove that they would have sold the property to a specifically identifiable person or entity for $6.6 million. We reject that approach.

■ Depending on the particular facts, in a case involving an allegedly unfavorable transaction, a plaintiff ordinarily may prove a more favorable result by proving that: either (1) he would have been able to obtain a better deal in the underlying transaction (commonly referred to as the "better deal" scenario); or (2) he would have been better off by walking away from the deal (commonly referred to as the "no deal" scenario). *See Viner v. Sweet*, 117 Cal.App.4th 1218, 12 Cal.Rptr.3d 533, 538 (2004); *Mosman v. Lindquist & Vennum, P.L.L.P.*, 2008 WL 467420 (Minn.Ct.App. No. A06–2418, Feb. 12, 2008) (unpublished opinion).[2]

Here, it is apparently undisputed that Actis would not have purchased the property as is for $6.6 million or absent the infrastructure credit provisions. Thus, there is no genuine issue of material fact under the "better deal" scenario. *Cf. Viner*, 12 Cal.Rptr.3d at 538–40 (no evidence that the plaintiff would have been able to secure better terms from the other party to a sale of business transaction); *Blackhawk Bldg. Sys.*, 428 N.W.2d at 290–92 (insufficient evidence that manager of business would have agreed to noncompetition covenant, which allegedly would have prevented subsequent loss of business); *Froom*, 872 A.2d at 1077–80 (unsupported assertions that investor or another investor would have agreed to terms more favorable to real estate developer insufficient to prove causation).

The sellers, however, maintain that they would have been better off by walking away from the deal, and would have done so had the brokers timely informed them of the infrastructure credit provisions. The sellers also presented evidence of the previous offers to buy the property (including the recent Bush offer), Mr. Groves' testimony that he wanted to get the property under contract quickly because he knew there were other potential buyers interested in purchasing it, and an appraisal by a licensed professional appraiser opining that the property was worth $6.6 million at the time of the sale to Actis. In effect, the sellers sought to prove causation of injury by way of the "no deal" scenario.

The dissent says that the sellers' theory of damages under the "no deal" scenario was that they "would have sold their property to some undefined buyer for $1.6 million more than they actually received in the Actis transaction." But, with all due respect, that is not precisely accurate. The sellers' complaint alleges that, as a result of the brokers' negligence, they lost the opportunity "to avoid the contracts and corresponding losses," incurred "lost revenue in the sale of the property," and lost the opportunity "to avoid the erroneous purchase price."

Similarly, in opposing summary judgment, the sellers argued that they would not have sold the property to Actis if the brokers had timely informed them of the infrastructure credit provisions. They further argued that the brokers' negligence (1) resulted in a sale of the property "for approximately $1.6 million less than its fair market value"; (2) "caused [the sellers] to lose an asset for $1.6 million less than its fair market value"; (3) "contractually bound [the sellers] to sell the [p]roperty for less than its value"; (4) caused them to sell "an asset worth $6,600,000.00 for the gross price of $4,935,073.40, a loss of over $1,600,000"; (5) deprived them of the opportunity to "retain[ ] their [p]roperty worth $6,600,00[0].00 rather than selling the same for approximately $1.6 million less than its market value"; and (6) caused them to lose "the ability to retain the subject property

---

2. There may be other ways to prove a more favorable result, again depending on the facts of the case. *See, e.g., Jerry's Enterprises*, 711 N.W.2d at 819–20 (attorney failed to advise client/buyer of seller's buy-back option in sales contract; client submitted proof of a more favorable result by alleging that he would have avoided triggering condition of buy-back option if attorney had told him about it).

without sustaining a forced loss on the purchase price . . . ."

Though the sellers indicated that they would have continued to try to sell the property, the fact remains they claimed loss of an asset worth more than what they received from Actis. We consider, then, whether such a loss is cognizable under the "no deal" scenario, and conclude that it is.

■■■ "As a general rule a party is entitled to recover for those damages which naturally and probably result from the negligence of another. . . . The principle of making the injured party whole underlies all negligence cases." *Cope v. Vermeer Sales & Serv. of Colo., Inc.*, 650 P.2d 1307, 1308–09 (Colo.App.1982) (citation omitted).

■■■ In cases involving damage to property (including real property), "the ordinary measure of damages is the diminution of market value of the property." *Goodyear Tire & Rubber Co. v. Holmes*, 193 P.3d 821, 827 (Colo.2008); *accord Frankfort Oil Co. v. Abrams*, 159 Colo. 535, 547, 413 P.2d 190, 196 (1966); *Scott v. Cty. of Custer*, 178 P.3d 1240, 1248 (Colo.App.2007) (applying this tort principle to an inverse condemnation claim); *Airborne, Inc. v. Denver Air Center, Inc.*, 832 P.2d 1086, 1092–93 (Colo.App.1992). "[T]hese damages focus on the damaged asset and measure the resulting change in the plaintiff's net worth." *Goodyear Tire*, 193 P.3d at 827 (citing 1 Dan D. Dobbs, *Law of Remedies* § 3.3, at 298 (2d ed. 1993)).

■■■ Similarly, where the plaintiff claims a complete loss of property, the measure of damages ordinarily is the property's value at the time of the loss. *See Smith v. Eichheim*, 147 Colo. 180, 183, 363 P.2d 185, 187 (1961) (destruction of crops); *Johnson v. Bd. of Cty. Comm'rs*, 138 Colo. 392, 394, 336 P.2d 300, 301 (1959) (measure of damages for negligent destruction of a bridge was its value on the date it was destroyed); *Duggan v. Bd. of Cnty. Comm'rs*, 747 P.2d 6, 9–10 (Colo.App. 1987) (damages for loss of a tractor involved in a collision; award supported by expert testimony of value); *see generally* Restatement (Second) of Torts § 927 (ordinary measure of damages for destruction or impairment of an interest in land is the value of the interest at the time of destruction or impairment); 1 Fowler V. Harper, Fleming James, Jr., & Oscar F. Gray, *Harper, James and Gray on Torts* § 2.36, at 273 (3d ed. 2006) (measure of damages for conversion is the value of the goods at the time of the conversion, plus interest); 2A Stuart M. Speiser, Charles F. Krause & Alfred W. Gans, *The American Law of Torts* § 8.32, at 54–55 (2009) (same as *Harper, James and Gray on Torts); id.* § 8.36, at 133–37 (where property is taken or destroyed, the measure of damages is the "actual cash value at the time of the taking or destruction").

■■■ In none of these situations must the plaintiff prove even that he wanted to sell or would have sold the property, much less that he would have sold it to a particular buyer for a particular price. As the supreme court observed in *Goodyear Tire*, the focus is on the change in the plaintiff's net worth. *See also Law of Remedies* § 3.3(3), at 299–300 (explaining why market value damages are appropriate in tort cases involving rights in tangible and intangible property, and observing that "such damages may be measured by bookkeeping losses, not realized or liquidated losses").[3] Thus, we conclude that a plaintiff may prove a more favorable result by proving he would have been better off merely by retaining an asset lost through transactional malpractice.

The dissent disagrees with this approach, arguing that this case does not involve damage to or diminution or loss of property. But the sellers here experienced a total loss of their property. They may have received payment for part of its value, but they still lost it.

---

**3.** We also observe that, in requiring the sellers to present evidence that another specifically identifiable person or entity would have purchased the property for $6.6 million, the district court imposed on the sellers a virtually impossible burden. Having lost the property as a result of the sale (which, under the facts here, they were legally obligated to complete), they could no longer market the property to prospective purchasers. No prospective purchaser would have made them an offer.

In concluding that the sellers were required to show that they would have sold the property to an identifiable buyer, the district court relied on two cases involving claims for lost profits, *Vanderbeek v. Vernon Corp.,* 50 P.3d 866 (Colo.2002), and *Roberts v. Holland & Hart,* 857 P.2d 492 (Colo.App.1993). The brokers too rely on these cases in their briefs on appeal (as does the dissent).

These cases are inapposite, however, for at least three reasons. First, the sellers do not seek recovery of lost profits. Rather, as noted, they claim loss of an asset; more specifically, that, as a result of the brokers' negligence, they had to sell an asset for less than its market value at the time of sale.

■■■ Second, the sellers' claim for damages—lost value of an asset—is for general damages. *See Law of Remedies* § 3.3(3). That is, they seek damages naturally resulting from the alleged wrongful conduct. *See Rogers v. Funkhouser,* 121 Colo. 13, 24, 212 P.2d 497, 502 (1949); Restatement (Second) of Torts § 904 (defining and distinguishing between general and special damages). A claim for lost profits, however, is not one for general damages, but, as the court expressly recognized in *Vanderbeek,* one for consequential (or special) damages. *Vanderbeek,* 50 P.3d at 868, 870 & n. 2; *see also Rogers,* 121 Colo. at 24, 212 P.2d at 502; *Law of Remedies* § 3.3(4), at 302–03. Such damages, in contrast to general damages, are not deemed to have been within the contemplation of the parties, "but grow out of an unusual and peculiar state of facts which may be known to one of the parties while unknown to the other." *Rogers,* 121 Colo. at 24, 212 P.2d at 502; *see also Vanderbeek,* 50 P.3d at 870 n. 2. Because consequential damages arise from unique circumstances, and are not such as necessarily result from wrongful conduct, they are subject to special, more demanding rules of pleading and proof. *See Vanderbeek,* 50 P.3d at 870–72. Thus, lost profits cases have little, if any, bearing on assessing a plaintiff's claim for general damages.

Third, *Vanderbeek* and *Roberts* concerned ultimately whether the plaintiffs' evidence of lost profits was credible or merely speculative. *See also Miami Int'l Realty Co. v. Paynter,* 841 F.2d 348, 351 (10th Cir.1988) (applying Colorado law); *Republic Nat'l Life Ins. Co. v. Red Lion Homes, Inc.,* 704 F.2d 484, 488–91 (10th Cir.1983) (applying Colorado law). Neither these cases nor any other lost profit case supports the notion that in attempting to prove general damages in a loss of property case, the plaintiff must prove that he would have been able to sell the property to a particular person for a particular price.

■■■ We now consider whether the sellers' evidence was sufficient to establish a genuine issue of material fact as to proximate cause under the no deal scenario, and conclude that it was. The sellers averred that they would not have gone through with the transaction had the brokers timely informed them of the infrastructure credit clauses.[4] They also presented evidence that the market value of the asset lost was, at the time of the loss, well in excess of the amount they received from the sale. This evidence included the appraisal—the bona fides of which the brokers have not challenged—and the Bush offer—which was near in time to the transaction at issue and which was withdrawn for a reason unrelated to price. *Cf. Wood v. Jamison,* 167 Cal.App.4th 156, 83 Cal.Rptr.3d 877, 880, 884 (2008) (borrower who could not afford loan and defaulted proved a more favorable result in transactional malpractice case by proving that if she had been properly advised, the loan transaction would not have occurred); *Mosman,* 2008 WL 467420, *4 (recognizing that although the seller failed to establish that he would have sold his business to another buyer, he could have established a genuine issue of material fact under the no deal scenario by proving the value of the business had he continued to own it).

Even were the sellers required to prove a likelihood that some other hypothetical person or entity would have purchased the property, the sellers' evidence would have been

4. We do not address whether the sellers' failure to timely and thoroughly read the sales contract renders the brokers' alleged negligence an insub-
stantial factor in causing the claimed injury. The brokers did not seek summary judgment on that basis.

sufficient to defeat summary judgment. The appraisal and the history of the sellers' efforts to sell the property show that there was a market for it. Indeed, Mr. Groves testified in his deposition that he felt a sense of urgency to reach a deal for the property because he knew of others (including two large retailers which he identified by name) who were interested in buying it. The Bush offer showed that at least one other prospective buyer was willing to pay $6.6 million (without an infrastructure credit) relatively close in time to when the sale to Actis took place.[5]

Further, the appraisal assigned a market value to the property. This market value was premised on the existence of a willing seller and a willing buyer, neither acting under compulsion. See Law of Remedies § 3.5, at 329.[6] Under the national standards applicable to real property appraisals, which apply in Colorado, the appraised market value necessarily "assume[d] a transfer of a property as of a certain date." Uniform Standards of Professional Appraisal Practice 2010–2011, available at http://www.appraisal foundation.org (adopted by the Colorado Dep't of Regulatory Agencies, Div. of Real Estate, Rule 11.1).

A party need not prove causation with certainty. See Kaiser Foundation, 741 P.2d at 719 (causation must be proved by a preponderance of the evidence); Viner, 135 Cal.Rptr.2d 629, 70 P.3d at 1053. And it may be proved by circumstantial evidence. Boatright v. Berkley United Methodist Church, 518 P.2d 309, 310 (Colo.App.1974) (not published pursuant to C.A.R. 35(f)). Though

speculation is clearly insufficient to satisfy this burden, the sellers presented more than mere speculation in support of their causation theory.

Therefore, we vacate the summary judgment on the sellers' negligence claims. It follows that we must also vacate the award of attorney fees and costs to the brokers.

### C. Breach of Fiduciary Duty Claim

The sellers contend the district court erred by granting summary judgment in the brokers' favor on the breach of fiduciary duty claim because the record demonstrates a genuine issue of material fact as to whether the brokers acted as the sellers' agents in connection with this real estate transaction. We disagree.

Effective January 1, 1994, the General Assembly enacted "An Act Concerning Brokerage Relationships in Real Estate Transactions" (the Act). See Ch. 218, sec. 1, §§ 12–61–801 to –811, 1993 Colo. Sess. Laws 979. The Act clarified the relationships between real estate professionals and the public. In a significant departure from the traditional common law view of agency relationships in real estate transactions, the Act recognized a non-agent real estate professional, the transaction broker. Hoff & Leigh, Inc. v. Byler, 62 P.3d 1077, 1078 (Colo.App.2002) (citing Sussman v. Stoner, 143 F.Supp.2d 1232, 1237–38 (D.Colo.2001)); see also Barfield v. Hall Realty, Inc., 232 P.3d 286, 291 (Colo. App.2010).

A real estate broker may act in a transaction as a single agent or as a transac-

---

5. The dissent faults us for relying on Mr. Groves' testimony and evidence of the other offers. But the sellers have argued that the evidence they presented in opposition to summary judgment was sufficient to establish the existence of a genuine issue of material fact, and the sellers presented this evidence with their oppositions. We therefore cannot ignore it. See Woodward v. Bd. of Directors, 155 P.3d 621, 624 (Colo.App. 2007) (when neither competence nor materiality of evidence offered in opposition to summary judgment is contested, "we may consider all this record evidence in our analysis") (citing Greenwood Trust Co. v. Conley, 938 P.2d 1141, 1149 (Colo.1997)). Though the sellers contend that the appraisal alone is sufficient to defeat summary judgment, we do not perceive that they

have thereby abandoned reliance on the other evidence of record.

6. Contrary to the dissent's suggestion, the appraisal did not merely assume a willing buyer and willing seller. Rather, the appraiser determined that, based on a number of factors, there was a willing buyer-willing seller market for the property at the appraised value. Nor does it matter that the appraiser could not identify a particular buyer who would have bought the property for $6.6 million. Appraisals do not identify specific buyers. The fact that an appraisal fails to identify a specific buyer does not render it incompetent or speculative evidence of value.

tion broker. *See* § 12–61–803(1), C.R.S.2011. A single agent is a broker who is engaged by and represents only one party in a real estate transaction, § 12–61–802(4), C.R.S.2011, whereas a transaction broker is "a broker who assists one or more parties throughout a contemplated real estate transaction with communication, interposition, advisement, negotiation, contract terms, and the closing of such real estate transaction without being an agent or advocate for the interests of any party to such transaction." § 12–61–802(6), C.R.S.2011. Though a broker acting as an agent owes fiduciary duties to his principal, a transaction broker is not in a fiduciary relationship any party to a real estate transaction. *Hoff & Leigh,* 62 P.3d at 1078; *see also* § 12–61–807(1), C.R.S.2011 ("A broker engaged as a transaction-broker is not an agent for either party."). In that regard, section 12–61–807(2), sets forth a specific description of the obligations, responsibilities, and duty of care of a transaction broker.

■ By statute, a broker defaults to the role of transaction broker. Under section 12–61–803(2), C.R.S.2011, "[a] broker shall be considered a transaction-broker unless a single agency relationship is established through a written agreement between the broker and the party or parties to be represented by such broker."

■ In this case, the district court ruled: Because no writing created an agency relationship between [the sellers] and [the brokers], and because the relevant statute precludes the imputation of fiduciary duties to [the brokers], [the brokers] had no fiduciary responsibilities to [the sellers] as a matter of law.

We agree with the court's analysis and similarly conclude that the sellers' breach of fiduciary duty claim fails as a matter of law because the sellers have not established the existence of a genuine issue of material fact that the brokers acted as their agents in connection with the sale to Actis.

The sellers pointed to their original listing agreement with Gibbons–White as sufficient evidence to create a triable issue of fact that the brokers entered into an agency relationship with them. We have reviewed this list-

ing agreement, which includes a standard form approved by the Colorado Real Estate Commission and an attached addendum. We agree with the district court that neither component of the agreement suggests the formation of an agency relationship to warrant a trial on the sellers' breach of fiduciary duty claim. The standard form is titled "Exclusive Right–To–Sell Listing Contract (Farm And Ranch/Vacant Land) (Transaction–Broker)" and clearly states that "Broker is not an agent or advocate of Seller or buyer." The attached addendum is titled "Transaction–Broker Addendum (For In–Company Transactions)." Importantly, the addendum requires the parties to check a specific box if they elect to structure their relationship as an agency relationship. There is no dispute that this box was not checked. Thus, there are repeated declarations in the parties' listing agreement that the brokers are serving as nonagent transaction brokers.

■ The sellers' reliance on *Messler v. Phillips,* 867 P.2d 128 (Colo.App.1993), *disapproved of in part by Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049, 1058 (Colo.1995), for the proposition that the brokers assumed duties and thereby became fiduciaries, despite the express language of the listing contract and transaction-broker amendment, is misplaced. *Messler* was decided before the enactment of the statutory framework discussed above. The statute's plain language provides that the exclusive method for a broker's assumption of agency status and fiduciary duties is a written agreement. § 12–61–803(2); *Hoff & Leigh,* 62 P.3d at 1078. Given the clear language of the statute, in the absence of a written agreement, any imposition of fiduciary duties on real estate brokers is a matter for the General Assembly.

In sum, because the sellers failed to produce a writing sufficient to make out a triable issue of fact on their claim that the brokers served as their agents and thereby owed them fiduciary duties, and because a fiduciary relationship cannot be established without such a writing, *see* § 12–61–803(2), the district court correctly granted summary judg-

ment in the brokers' favor on the sellers' breach of fiduciary duty claim.

### III. The Brokers' Cross–Appeal

■ Because we have vacated the summary judgment on the sellers' negligence claims, we must address the brokers' contention on cross-appeal that the district court erred in striking their nonparty fault designations. We perceive no error.

The brokers filed a designation of nonparty fault pursuant to section 13–21–111.5 naming Mr. Groves. The theory of the designation was that Mr. Groves had a duty to disclose to the sellers that he had inserted the infrastructure credit provisions in the contracts. The brokers subsequently adopted the lawyers' nonparty designation of Actis, which appeared to be based on the same theory.

The district court granted the sellers' motion to strike the designations, concluding that the brokers had failed to articulate a basis for imposing any duty on Mr. Groves under the circumstances. We review that conclusion de novo. *See Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo.1987) (whether a particular person owes a legal duty to another person is a question of law); *Western Innovations, Inc. v. Sonitrol Corp.*, 187 P.3d 1155, 1158 (Colo.App.2008) (same; appellate review of such a determination is de novo).

The provisions at issue were contained in contracts that the sellers (who were represented by counsel) were perfectly capable of reading. The brokers alleged no facts that would show Mr. Groves somehow concealed the provisions from the sellers or in any way misled the sellers. Nor have the brokers cited any legal authority for the proposition that an adversary in a business transaction has a duty to expressly inform the other party of provisions in a written document during the course of negotiations.

We conclude that the brokers failed to allege facts which, if proved, would establish a prima facie case that the potential nonparties breached a legal duty to the sellers. Therefore, the district court did not err in striking the brokers' nonparty designations

of Mr. Groves and Actis. *See Stone,* 41 P.3d at 709 (nonparty designation should be stricken when designating party fails to establish such a prima facie case); *Redden v. SCI Colo. Funeral Servs., Inc.,* 38 P.3d 75, 80–81 (Colo.2001) (same; affirming striking of a designation that was insufficient as a matter of law; designation failed to connect alleged facts with the elements of negligence); *see also* § 13–21–111.5(3)(b), C.R.S. 2011 (designation applies to one who is "wholly or partially at fault").

### IV. Appellate Attorney Fees

Finally, we turn to the brokers' request for an award of attorney fees incurred in this appeal.

Under C.A.R. 39.5, "[i]f attorney fees are otherwise recoverable for the particular appeal, the party claiming attorney fees shall specifically request them, and state the legal basis therefor, in the party's principal brief in the appellate court."

In their answer brief, the brokers specifically request attorney fees pursuant to the attorney fees provision of the listing agreement. Given our conclusion that the court erroneously granted the brokers' motion for summary judgment on the negligence claim, the brokers are not yet prevailing parties. Therefore, we deny the brokers' request for attorney fees incurred on appeal.

The judgment is affirmed as to the breach of fiduciary duty claim and vacated as to the negligence claims. The order striking the brokers' nonparty designations is affirmed. The award of attorney fees and costs is vacated. The case is remanded for further proceedings on the sellers' negligence claims.

Judge ROY concurs.

Judge LOEB concurs in part and dissents in part.

Judge LOEB concurring in part and dissenting in part.

I concur in Section II. C. of the majority opinion affirming the summary judgment on the sellers' breach of fiduciary duty claim. However, I respectfully dissent regarding the majority's resolution of the sellers' negli-

gence claim in Section II.B. of the opinion. In my view, the sellers failed to submit evidence sufficient to establish a genuine issue of material fact as to causation and the fact of damages. Rather, the sellers' evidence in support of their theory of causation and damages was wholly speculative, and, accordingly, was not sufficient to withstand summary judgment on their negligence claims.

Initially, I note that I am in general agreement with the majority's recitation of the factual background here and with the majority's articulation of the basic legal standards that govern this case. In that regard, I agree that (1) a plaintiff in a case of alleged transactional professional negligence is required to prove that, but for the professional's negligence, he or she would have obtained a more favorable result, and (2) this case implicates the "no deal" scenario, where a plaintiff alleges he or she would have been better off walking away from the deal. *See Viner v. Sweet*, 117 Cal.App.4th 1218, 12 Cal.Rptr.3d 533, 538 (2004) (*Viner II*).

I disagree with the majority, however, in its analysis of how a plaintiff may satisfy the requirement of proving causation and the fact of damages in a case such as this, and its conclusion that the sellers here satisfied that requirement.

The sellers contend the district court erred by granting summary judgment in favor of the brokers on the professional negligence and negligent supervision claims. According to the sellers, the record demonstrates a genuine issue of material fact as to whether the brokers' alleged negligence caused damages to the sellers, and, therefore, they are entitled to a trial on the merits of these claims. I disagree.

As with any negligence claim, to recover on a claim of professional negligence, a plaintiff must show that the professional breached a duty of care owed to the plaintiff and thereby caused the plaintiff to suffer damages. *See, e.g., City of Westminster v. Centric–Jones Constructors*, 100 P.3d 472, 485 (Colo.App.2003); *McCafferty v. Musat*, 817 P.2d 1039, 1043 (Colo.App.1990); *see also* CJI–Civ. 4th 15:25 (2010) (instruction on elements of liability in a professional malpractice case same as in a basic negligence case).

To recover on a claim of negligent supervision against the employer of a professional, a plaintiff must prove that the employer had a duty to prevent an unreasonable risk of harm to third persons to whom the employer knew or should have known that the professional would cause harm. *Keller v. Koca*, 111 P.3d 445, 448 (Colo.2005). However, unless harm results from the wrongful action or actions of the person supervised, any negligence occurring in the supervision cannot be said to be the cause of any harm. *Arnold v. Colo. State Hosp.*, 910 P.2d 104, 107 (Colo.App.1995).

Therefore, both varieties of negligence claims at issue here against the brokers require the plaintiff to demonstrate a causal connection between the breach of the professional's duty and the resulting injury. A plaintiff proves causation by showing by a preponderance of the evidence that the injury would not have occurred but for the defendant's negligent conduct. *Kaiser Found. Health Plan v. Sharp*, 741 P.2d 714, 719 (Colo.1987); *Allen v. Martin*, 203 P.3d 546, 565 (Colo.App.2008).

Where, as here, a plaintiff confronts a motion for summary judgment alleging lack of causation, the plaintiff must establish a triable issue of fact. *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 713 (Colo.1987). The plaintiff need not prove causation with absolute certainty, but causation must be established beyond mere possibility or speculation in order to avoid summary judgment in the moving party's favor as a matter of law. *Kaiser*, 741 P.2d at 719.

In this case, the district court granted summary judgment in the brokers' favor on the negligence claims because the sellers could not establish that, but for the brokers' alleged negligence, they would have sold the forty-nine-acre portion of their property for a more favorable amount. According to the court,

> [b]ecause [the sellers] have not provided any evidence other than impermissible speculation in support of their negligence claims against [the brokers], they cannot, as a matter of law, demonstrate that [the brokers'] negligence caused them injury.

Based upon my de novo review of the record, I agree with the court that the sellers did not put forth sufficient evidence to create a genuine issue of material fact that the brokers' professional negligence caused damages to them.

I start my analysis with an articulation of the sellers' theory of causation and damages. From the very beginning of this case through this appeal, the sellers contended that, but for the negligence of the brokers, they would not have sold their property to Actis, but rather would have sold their property to some undefined buyer for $1.6 million more than they actually received in the Actis transaction. Contrary to the majority's analysis, as I interpret the record, the sellers have never simply said they lost their property as a result of the brokers' alleged negligence. Indeed, there is no dispute that Actis paid the sellers in excess of $5 million for the subject property. Rather, the sellers have always defined their injury or fact of damages as the opportunity to sell their property for an extra $1.6 million, or what they "anticipated" they were going to receive in the Actis transaction.

The only evidence provided by the sellers to create a triable issue as to causation was the affidavit of a real estate appraiser who valued the land sold to Actis. According to this appraiser, the market value of the land was $6.6 million, both on the day that the parties entered into their sales contract and on the day of the closing. However, as the district court properly observed, this affidavit established only that the land was worth $6.6 million; it did not establish that the sellers would have been able to sell the land to any buyer for that amount. In other words, we are left guessing as to whether the sellers would have been able to sell the property for a more favorable amount (either during the contract period with Actis or any time in the future) had they known about the credit provision that reduced the purchase price. Even the appraiser agreed in his deposition testimony that he could not determine whether the sellers would be able to find a buyer willing to pay the full market value:

Q: [T]here's no way you can determine that someone actually would have bought this property if Actis hadn't, is there?

A: [T]hat's a hypothetical I can't begin to answer.

There is a difference between the fact of damages to the plaintiff and the amount of the damages, see *Miami Int'l Realty Co. v. Paynter,* 841 F.2d 348, 350 (10th Cir.1988); *U.S. Nat'l Bank v. Bartges,* 120 Colo. 317, 335–36, 210 P.2d 600, 609 (1949), and here, I conclude the sellers failed to put on sufficient evidence of the former. The appraiser's valuation of the land alone does not establish beyond mere possibility or speculation that the sellers suffered a financial loss because of the brokers' professional negligence. *See City of Westminster,* 100 P.3d at 485–86 (opinion by expert that alleged negligence "may have resulted in damage" is not sufficient evidence that the defendant's alleged breach of the standard of care caused the plaintiff injury; testimony as to what may have happened does not create a genuine issue of material fact as to causation).

The majority argues that, because the appraisal here assumed a willing seller and a willing buyer, it provided sufficient evidence to overcome summary judgment. But, in my view, it is that very assumption that creates the speculation in the sellers' proof. I submit that something more than a mere assumption is necessary to show that the sellers would have sold the property at all, let alone at a price $1.6 million more than they received from Actis.

Moreover, the majority's reliance on the Bush offer to bolster the sellers' claim is misplaced for two reasons. First, although the fact of the Bush offer is in the record, the sellers never rely on that fact to support their contention that there is a disputed issue of material fact as to their theory of causation. (Nor do they even mention Mr. Groves' testimony in their briefs on appeal in support of their argument on the causation issue.) Rather, their briefs on appeal rely only on the appraisal of their property. Second, as recognized by the majority, the Bush offer fell through, and the sellers never offered any evidence to show that Bush would have thereafter been interested in purchasing the

property at all, let alone at the price desired by the sellers. Similarly, the majority's reliance on previous offers for the property is not persuasive. These offers were remote in time from the Actis transaction, and there is no contention that any of those offers was even close to the price the sellers were seeking in the Actis transaction.

I also reject the sellers' argument (apparently accepted by the majority) that the district court imposed an impossible burden on them because it required them to show "an actual sale on an actual date" in order to survive the brokers' motion for summary judgment. According to the sellers, they only learned of the credit provision the week prior to closing, and once they transferred their land, they "lost the ability to drum up a willing buyer to purchase a parcel of land which they no longer owned." In the first instance, although I recognize it is not an issue in this appeal, I question why the sellers chose to close on this transaction once they learned that Actis would receive a $1.6 million credit against the purchase price. Nevertheless, I do not read the court's order as requiring proof of an actual sale to overcome summary judgment or otherwise imposing an impossible evidentiary burden on the sellers at the summary judgment stage. Rather, the court simply required some evidence, beyond impermissible speculation, to demonstrate that the brokers' negligence caused the sellers to suffer the loss they were alleging. Thus, expert testimony regarding current market conditions and trends or regarding the likelihood of a sale at a price higher than what Actis paid might have sufficed to raise a triable issue of fact that, but for the brokers' alleged negligence, the sellers could have sold their land for a more favorable amount. Cf. Republic Nat'l Life Ins. Co. v. Red Lion Homes, Inc., 704 F.2d 484, 489–90 (10th Cir.1983) (experienced home developer's testimony that past experience and market analysis indicated that homes would have sold easily and that past experience showed developer would have earned a profit on sale of homes was sufficient to overcome motion for directed verdict based on speculative damages).

While causation is usually a question of fact to be decided by the jury, if the facts are undisputed and reasonable minds could draw but one inference from them, causation becomes a question of law for the court. Allen, 203 P.3d at 566. Here, even granting the sellers all favorable inferences that may be drawn from the record, I conclude that they did not present sufficient evidence of causation, and, therefore, the court properly granted summary judgment in the brokers' favor on the negligence claims.

The majority finds inapposite cases where the sellers of property seek lost profits. However, I find those cases helpful to the analysis here because they more closely mirror the sellers' theory of causation and damages, namely, they lost the opportunity to sell their property for an extra $1.6 million. See, e.g., Roberts v. Holland & Hart, 857 P.2d 492, 497–98 (Colo.App.1993) (distinguishing the evidence presented in Republic National and ruling that summary judgment in the defendant's favor was proper where the plaintiff's evidence of the fact of damages in the form of lost profits was speculative and based upon guesses and generalizations of the plaintiff and other affiants); Blackhawk Bldg. Sys., Ltd. v. Law Firm of Aspelmeier, Fisch, Power, Warner & Engberg, 428 N.W.2d 288, 291 (Iowa 1988) (trial court should have granted the defendant's motion for a judgment notwithstanding the verdict where there was insufficient evidence to connect the plaintiff's claimed damages to the defendant's negligent drafting of an employment contract); Raske v. Gavin, 438 N.W.2d 704, 706–07 (Minn.Ct.App.1989) (proper to grant the defendant's summary judgment motion because there was no evidence that the defendant's lack of legal advice was the proximate cause of the plaintiff's harm); cf. Miami Int'l Realty Co., 841 F.2d at 350–51 (proper to submit issue of damages to the jury where there was credible and substantial evidence that the plaintiff lost prospective profits as a result of the defendant's legal malpractice); Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd., 711 N.W.2d 811, 819–20 (Minn.2006) (sufficient testimony to create a question of fact as to whether, but for the defendant's negli-

gence, the plaintiff would have obtained a more favorable result in the transaction).

I am not persuaded by the majority's citation to cases involving damage to property where the measure of damages is diminution of market value of the property. *See, e.g., Goodyear Tire & Rubber Co. v. Holmes,* 193 P.3d 821, 827 (Colo.2008). Here, by contrast, we are not faced with a claim involving damage to property or a diminution of market value. Rather, this case involves a claim of a lost opportunity to sell property at a higher price. Similarly, the majority's reliance on cases where a complete loss of property was at issue is misplaced here. Those cases all involved the destruction or total loss of property and, in one cited case, evidence of a specific and recognized market for sale of the property. *See, e.g., Smith v. Eichheim,* 147 Colo. 180, 183, 363 P.2d 185, 187 (1961) (total destruction of mature crops and evidence of a recognized and specific market for sale of such crops); *Johnson v. Bd. of Cty. Comm'rs,* 138 Colo. 392, 394, 336 P.2d 300, 301 (1959) (measure of damages for negligent destruction of a bridge was its value on the date it was destroyed). Again, here, by contrast, the sellers' property was not destroyed, nor did the sellers present any competent evidence that there was a recognized market for their property. And, as I have discussed above, I do not find the appraiser's affidavit, by itself, to create an issue of material fact as to causation of the claimed injury here.

I find more persuasive decisions from courts in other states that have expressly addressed the causation and fact of damages issue in a professional negligence case involving a "no deal" scenario. For example, in *Viner v. Sweet,* 30 Cal.4th 1232, 135 Cal. Rptr.2d 629, 70 P.3d 1046, 1050 (2003) (*Viner I*), an attorney malpractice case, the California Supreme Court expressly held that the "but for" causation test applies in a case of alleged transactional negligence. The court then set forth the following reasoning, which I find applicable here:

> "When a business transaction goes awry, a natural target of the disappointed principals is the attorneys who arranged or advised the deal. Clients predictably attempt to shift some part of the loss and disappointment of a deal that goes sour onto the shoulders of persons who were responsible for the underlying legal work. Before the loss can be shifted, however, the client has an initial hurdle to clear. *It must be shown that the loss suffered was in fact caused by the alleged attorney malpractice.* It is far too easy to make the legal advisor a scapegoat for a variety of business misjudgments unless the courts pay close attention to the cause in fact element, and deny recovery where the unfavorable outcome was likely to occur anyway, the client already knew the problems with the deal, or where the client's own misconduct or misjudgment caused the problems. It is the failure of the client to establish the causal link that explains decisions where the loss is termed remote or speculative. Courts are properly cautious about making attorneys guarantors of their clients' faulty business judgment."

*Viner I,* 135 Cal.Rptr.2d 629, 70 P.3d at 1051–52 (emphasis in original) (quoting John H. Bauman, *Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood,* 61 Temp. L.Rev. 1127, 1154–55 (1988)).

After remand by the California Supreme Court and a retrial, the California Court of Appeals rejected the plaintiffs' argument that in a "no deal" scenario, they established causation based on their claim that the lawyers' negligence in documenting a transaction caused them, in part, to lose various business opportunities. *See Viner II,* 12 Cal. Rptr.3d at 540–43. In that regard, the court concluded that the plaintiffs "presented no evidence any better deal was possible—the deal they wanted or a different but nonetheless economically preferable transaction with either [the buyer] or some other entity." *Id.* at 544 n. 13.

Similarly, in *Bourne v. Lajoie,* 149 Vt. 45, 540 A.2d 359 (1987), the seller in a real estate transaction brought a malpractice claim against her lawyer, alleging, in part, that the lawyer's negligent draftsmanship of a deed that referenced a list of parcels to be retained by the seller caused her to suffer damages in the form of a lost opportunity to sell two parcels omitted from the list in the

deed. The Vermont Supreme Court affirmed the trial court's dismissal of this claim for lack of causation. The court held that this "contention is based only on [the seller's] speculation that she would have been able to sell the property, rather than on evidence of an actual offer from a prospective purchaser which she was unable to pursue." *Id.* at 364.

Other state courts have reached similar conclusions in cases involving transactional professional negligence. *See Girardi v. Gabriel,* 38 Mass.App.Ct. 553, 649 N.E.2d 805, 808–09 (1995) (upholding summary judgment for the defendant-attorneys on grounds that the plaintiff's evidence consisted only of "assumptions" and that the plaintiff did not present evidence from which a jury could conclude that the attorneys' negligence caused an estate to lose its assets); *Froom v. Perel,* 377 N.J.Super. 298, 872 A.2d 1067, 1075–80 (N.J.Super.Ct.App.Div.2005) (rejecting the plaintiffs' claim that alleged transactional negligence by their attorneys caused the plaintiffs to lose a 50% interest in a real estate development project on the grounds that expert testimony on the issue of causation was necessary and that the testimony presented by the plaintiffs was no more than bare conclusions that were unsupported by any factual evidence).

In sum, I conclude that the sellers' evidence here, in response to the brokers' motion for summary judgment, was conclusory and speculative and did not satisfy the sellers' burden to establish that there was a triable issue of fact on causation and fact of damages. *See Cont'l Air Lines, Inc.,* 731 P.2d at 713. Accordingly, I would affirm the district court's summary judgment in favor of the brokers on the negligence claims.

Because I would affirm the summary judgment on all claims, I would not (and do not) address the cross-appeal issue discussed in Section III of the majority opinion.